IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                      CRIMINAL ACTION NO. 2:08-cr-00117

ROBERT LEE VELTRI,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the court is the defendant's Motion to Suppress [Docket 27]. For the reasons herein, the motion is **GRANTED**.

**I. Factual Background**

The events underlying the defendant's motion are as follows. On April 23, 2008, Officer Mark Petty of the Charleston Police Department was on patrol in the East End of Charleston when he received the following Charleston Police Department Officer Chat Log report:

> EXTRA PATROL EAST END AROUND WASHINGTON ST E AND THE CROSS ST WIT H GINO'S A W/M ON A BICYCLE SILVER IN COLOR DRK BRN OR BLACK SHOR T HAIR SMALLER BUILT WITH MUSCULAR BUILT WEARING JEANS AND T SHIRT HE HAD SEVERAL TATTOOSS ON HIS FACE THE ONES AROUND HIS
>
> EYES CURVED AROUND THEM AND DOWN HIS FACE. HE TRIED TO GET A MAN TO HIT HIM AT THE STOP LIGHT AT WASHINGTON ST IT WAS A 10 SPEED TYPE BIKE AND THE BOY WAS IN HIS LATE TEENS TO EARLY TWENTIES

(Gov't Resp. Def. Mot. Suppress, Ex. A.)  Officer Petty began driving towards the location described in the report.  On his way there he saw the defendant, Mr. Robert Veltri, riding his bicycle.  Recognizing that Mr. Veltri's appearance matched the description in the report, Officer Petty pulled his patrol car alongside the sidewalk where Mr. Veltri was riding and asked him to stop.  (Tr. Mot. Hr'g Nov. 24, 2008 at 14:21-15:6 [Docket 37].)  Mr. Veltri complied, but remained on his bicycle.  Officer Petty then exited his vehicle and walked over to Mr. Veltri.  (*Id.* at 15:9-22.)

Officer Petty asked Mr. Veltri if he was trying to ride his bicycle into moving traffic.  Mr. Veltri explained that the brakes on his bicycle were bad and that is why it appeared that he was trying to run into traffic.  (*Id.* at 17:8-13.)  Having determined that Mr. Veltri was not riding his bicycle into traffic, Officer Petty proceeded to make a number of requests of him.  He asked Mr. Veltri for identification, asked Mr. Veltri to step off of his bicycle, and also told Mr. Veltri that he wanted to pat him down for weapons.  (Gov't Resp. Def.'s Mot. Suppress, Ex. B, Tr. Preliminary Hr'g at 3:24-25:3.)  Officer Petty testified that he made these requests in order to check whether Mr. Veltri had any outstanding warrants or other things of that nature, and also to ensure his own safety.  (*Id.* at 3:24-4:6.)  Mr. Veltri did not get off of his bicycle and told Officer Petty that he did not want to be searched.  Officer Petty explained that he did not want to search Mr. Veltri, but only wanted to pat him down for weapons for the officer's own safety while they spoke.  Mr. Veltri again told Officer Petty that he did not want to be searched.  Officer Petty again explained that he did not want to search Mr. Veltri, but only pat him down for weapons.  (*Id.* at 4:3-10.)

Officer Petty testifies that at that point Mr. Veltri made a movement with his right hand indicating that he might flee or perhaps be reaching for something in his pocket.  (*Id.* at 4:11-13.)  In response, Officer Petty grabbed Mr. Veltri's left wrist, pulled Mr. Veltri toward him and off of

-2-

his bicycle, and placed Mr. Veltri's hands behind his back. (Tr. Mot. Hr'g Nov. 24, 2008 at 20:25-21:2.) Officer Petty asked Mr. Veltri whether he had a gun and Mr. Veltri responded that he did have one in his pocket.[1] (Mot. Hr'g Dec. 1, 2008, Def. Exs. G-1, G-2.) Officer Petty then arrested Mr. Veltri and placed him in handcuffs. (Tr. Mot. Hr'g Nov. 24, 2008 at 22:10-11.) In a search of Mr. Veltri incident to the arrest, Officer Petty found bags in Mr. Veltri's pocket with substances that later tested positive as being marijuana and crack cocaine. (*Id.* at 27:6-10.)

Mr. Veltri was subsequently indicted by a grand jury for possessing cocaine base, or "crack," with the intent to distribute, and also for carrying a firearm in relation to a drug trafficking crime [Docket 16]. On July 31, 2008, the defendant filed a motion to suppress any evidence seized during his encounter with Officer Petty on April 23, 2008. (Def. Mot. Suppress ¶ 10.) The defendant argues that the "seizure and search of Mr. Veltri and his effects was obtained in violation of Mr. Veltri's right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment of the United States Constitution . . . ." (*Id.*)

## II. Discussion

The government offers three alternative theories explaining why Officer Petty's search and seizure of Mr. Veltri was not a Fourth Amendment violation. First, the government argues that because Officer Petty and Mr. Veltri were engaged in a voluntary citizen-police encounter, the Fourth Amendment was not implicated. (Gov't Resp. Def.'s Mot. Suppress 6-7.) Second, the government argues that Officer Petty did not violate Mr. Veltri's Fourth Amendment rights because

---

[1] There is some factual dispute over whether Mr. Veltri ever denied having a gun. (Gov't Resp. Def.'s Mot. Suppress, Ex. C; Tr. Mot. Hr'g, Nov. 24, 2008 at 21:12-22:9.) The audio recording of the encounter, however, demonstrates that Mr. Veltri never denied having the gun. (Mot. Hr'g Dec. 1, 2008, Def. Ex. G-1.)

he had a reasonable suspicion of criminal activity sufficient to conduct an investigatory stop, or "*Terry* stop." Moreover, the government argues that by dropping his hand towards his right side, Mr. Veltri provided grounds for Officer Petty to consider Mr. Veltri armed and dangerous and to conduct a protective search. (*Id.* at 7-11.) Finally, the government argues that even if Officer Petty and Mr. Veltri were initially engaged in a consensual encounter, the encounter escalated into a *Terry* stop when Mr. Veltri dropped his right hand and thus raised a reasonable suspicion that he was engaged in criminal activity and was armed and dangerous. (*Id.* at 12-15.)

## A.

The principles applicable to this case are well established. By providing that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated," the Fourth Amendment serves to prevent the arbitrary and oppressive interference by enforcement officials of the privacy and personal security of individuals. US Const. amend IV; *see United States v. Brown*, 401 F.3d 588, 592 (4th Cir. 2005) (quoting *INS v. Delgado*, 466 U.S. 201, 215 (1984)). Nevertheless, "[l]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or another public place . . . ." *Florida v. Bostick*, 501 U.S. 429, 434 (1992) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). As long as the interaction between the police officer and the approached individual is consensual, no Fourth Amendment scrutiny is triggered. *Id.* "Indeed, officers remain free to seek cooperation from citizens on the street without being called upon to articulate any level of suspicion of justification for their encounters." *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000); *see also United States v. Weaver*, 282 F.3d 302, 209 (4th Cir. 2002) ("[B]rief encounters between police and citizens . . . require no objective justification."). Accordingly, in a voluntary police-citizen encounter, a

police officer may ask questions, request and examine identification, and even search the individual's luggage, "as long as the police do not convey a message that compliance with their request is required." *Bostick*, 501 U.S. at 435. Moreover, because the encounter is consensual, the approached individual retains the right to "disregard the police and go about his business." *Id.* at 434 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). The individual may "ignore his interrogator and walk away," *Burton*, 228 F.3d at 527 (quoting *Terry v. Ohio*, 392 U.S. 1, 33 (1968) (Harlan, J., concurring)), refuse to cooperate, and even remain silent in the face of the officer's inquiries. *See id.* at 529.

If the stop loses its consensual nature, however, then Fourth Amendment scrutiny is triggered. *See Bostick*, 501 U.S. at 434. "[A] 'seizure' warranting protection of the Fourth Amendment occurs when, in view of the totality of the circumstances surrounding the 'stop,' a reasonable person would not feel free to leave or otherwise terminated the encounter." *Weaver*, 282 F.3d at 309. The totality of the circumstances test is an objective one, and in applying the test, a court may look to numerous factors, including:

> the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen.

*Id.* at 310.

"A police officer may elevate a police-citizen encounter into an investigatory detention only if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *Burton*, 228 F.3d at 527 (internal quotations omitted); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly

detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'"). The reasonable suspicion analysis must focus on the police officer's reasonable suspicion before the seizure. *See United States v. Gen.*, 435 F. Supp. 2d 502 (E.D.N.C. 2006). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989). "Moreover, [a court's] determination of reasonable suspicion must give due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004). The reasonable suspicion standard, though less demanding than the probable cause standard, does require a minimal level of objective justification. *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). "Reasonable suspicion is something more than an inchoate and unparticularized suspicion or hunch." *Burton*, 228 F.3d at 527 (internal quotation and citation omitted). The government bears the burden of "articulat[ing] facts sufficient to support reasonable suspicion." *Id.* at 528.

The Fourth Circuit has identified several factors that can contribute to the totality of the circumstances supporting a police officer's reasonable suspicion of criminal activity. These factors include: (1) the defendant's presence in a high crime area, *see Perkins*, 363 F.3d at 321, *United States v. Mayo*, 361 F.3d 802, 807 (4th Cir. 2004); (2) informant tips, *Perkins*, 363 F.3d at 322-25; (3) time of day, *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993); (4) observation by the officer of what appears to be criminal conduct, *Lender*, 985 F.2d at 154; (5) the defendant's conduct, including evasive or unusually nervous behavior, *Mayo*, 361 F.3d at 807-08; and (6) a noticeable

bulge in the defendant's clothing that could be a firearm, *United States v. Black*, 525 F.3d 359, 365 (4th Cir.); *United States v. Baker*, 78 F.3d 135, 137 (4th Cir. 1996).

"Once an officer has a basis to make a lawful investigatory stop, he may protect himself during that stop by conducting a search for weapons if he 'has reason to believe that the suspect is armed and dangerous.'" *Burton*, 228 F.3d at 528 (quoting *Adams v. Williams*, 407 U.S. 143,146 (1972)); *see also Mayo*, 361 F.3d at 807 (explaining that before conducting a protective frisk, a police officer must have a reasonable suspicion that criminal activity is afoot and also that the suspect is armed and dangerous). An officer may not, however "conduct this protective search for purposes of safety until he has reasonable suspicion that supports the investigative stop." *Burton*, 228 F.3d at 528. As explained by Justice Harlan in his concurring opinion to *Terry v. Ohio*, "If and when a policeman has a right . . . to disarm a person for his own protection, he must first have a right not to avoid him but to be in his presence." *Terry*, 392 U.S. at 32 (Harlan, J., concurring).

## B.

In order to determine whether Officer Petty searched Mr. Veltri and seized the firearm and drugs in violation of the Fourth Amendment, I must first determine whether Mr. Veltri was seized, and if so, whether Officer Petty's actions were supported by a reasonable suspicion that criminal activity was afoot. First, I **FIND** that the encounter between Officer Petty and Mr. Veltri was initially a voluntary police-citizen encounter. Officer Petty pulled up next to the defendant and asked him to stop. There is no evidence to suggest that: Officer Petty activated his lights or siren; there were other officers present; Officer Petty displayed his weapon; or, that Officer Petty physically touched the defendant. (Tr. Mot. Hr'g Nov. 24, 2008 10:24-11:7.) The defendant stopped, Officer Petty exited his vehicle and asked the defendant if he was trying to run into traffic.

The defendant responded that he was not. At that point, having determined that Mr. Veltri was not engaged in the activity described in the Officer Chat Log Report, Officer Petty asked for Mr. Veltri's identification, told him he wanted to check him for locals or any warrants, and asked him to step off his bike. In response, the defendant stated he did not want to be searched. Officer Petty responded that he did not want to search Mr. Veltri, but rather pat him down for officer safety reasons. Defendant again responded, "No, I don't want you to search me." Officer Petty again said that all he wanted to do was check for warrants.

Up to this point, Officer Petty did nothing to indicate that Mr. Veltri was compelled to comply with these requests or that Mr. Veltri could not leave the encounter and go about his business. In fact, Mr. Veltri's expressions that he did not want to be searched confirm that he did not feel compelled to respond to these requests. Furthermore, Officer Petty testified that if Mr. Veltri had ridden off and ended the encounter at this point, he would not have tried to restrain Mr. Veltri. Because Officer Petty did not convey a message that compliance was mandatory, and because a reasonable person in Mr. Veltri's position would have, under the totality of the circumstances, felt free to leave, I **FIND** that the encounter between Officer Petty and Mr. Veltri was a voluntary, consensual police-citizen encounter through the point that Officer Petty asked Mr. Veltri for consent to pat him down.

I **FIND**, however, that the encounter between Officer Petty and Mr. Veltri escalated from a voluntary encounter to a seizure when Officer Petty grabbed Mr. Veltri's wrist, pulled him of the bicycle, and placed Mr. Veltri's arms behind his back. It is abundantly clear at that point that Mr. Veltri was not free to leave and was therefore "seized." *See Weaver*, 282 F.3d at 309; *see also Burton*, 228 F.3d at 527 (explaining that a seizure occurs when "an officer, by means of physical

force or show of authority, has in some way restrained the liberty of a citizen . . . ." ) (internal quotations omitted). Accordingly, I must apply Fourth Amendment scrutiny to this interaction and determine whether the seizure was supported by reasonable suspicion.

The government argues that when Officer Petty seized Mr. Veltri, he had reasonable suspicion that criminal activity was afoot based on the information in the Officer Chat Log. This argument is unavailing. Officer Petty admits that he determined that Mr. Veltri "wasn't trying to run into traffic" before he requested Mr. Veltri's identification and asked to search Mr. Veltri. (Gov't Resp. Def.'s Mot .Suppress, Ex. B, Tr. Preliminary Hr'g 3:25-4:3.) He further explains that he requested Mr. Veltri's identification, not for investigating Mr. Veltri's bicycle riding, but rather to check for warrants. (Tr. Mot. Hr'g Nov. 24, 2008 at 17:21-23.) Thus, the inquiries that led to Officer Petty grabbing Mr. Veltri's wrist were not part of an investigation into Mr. Veltri's reckless bicycle riding. Officer Petty had already determined that Mr. Veltri was not trying to commit the traffic crimes described in the Officer Chat Log, was no longer investigating the bicycle activities, and did not have a reasonable suspicion that such crimes were afoot.

The government has not, however, sustained its burden of articulating facts supporting a reasonable suspicion that any *other* crimes were afoot. Even under the low bar set by the reasonable suspicion standard, the government must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. In this case, the government offers two types of facts that they argue create an inference of criminal activity. First, the government argues that Officer Petty's general knowledge about Mr. Veltri supported a reasonable suspicion that criminal activity was afoot at the time that he seized Mr. Veltri. Officer Petty had "heard from other officers[] that [Mr. Veltri] was involved

-9-

in the drug game and that he hung out in the east end area." (Tr. Mot. Hr'g Nov. 24, 2008 at 11:22-12:1.) Officer Petty had also heard that Mr. Veltri frequented the Shop & Go, a store at the intersection described in the Officer Chat Log report. (*Id.* at 12:21-13:1.) Officer Petty knew the Shop & Go to be a place where drug and firearm activity occurred. (*Id.* at 13:2-11.) Officer Petty knew that Mr. Veltri associated with drug dealers and that "there is often an association between illegal drugs and firearms activity." (*Id.* at 13:15-14:20.) But in his testimony during the December 1, 2008 pretrial motions hearing, Officer Petty also admitted that he did not know of any incidents of Mr. Veltri being arrested for drug or firearm violations, or even of being known to carry such items.

Though I credit the judgement of a police officer based on his experience and training, *see Perkins*, 363 F.3d at 321, these proffered facts cannot support a reasonable suspicion that criminal activity was afoot. The facts provide general information about drug trafficking crimes in Charleston and about Mr. Veltri's associates. None of the facts suggest that Mr. Veltri specifically was carrying drugs or a firearm at the time that he was stopped. If such generalities were sufficient to raise a reasonable suspicion that a crime was afoot, then almost any individual on a bicycle in the East End area could be stopped by a police officer and subsequently searched just for making a normal hand movement. The Fourth Amendment provides greater protection than that.

In addition to Officer Petty's general knowledge of drug trafficking in Charleston, the government places great emphasis on the movement of Mr. Veltri's right hand from the bicycle handlebars to Mr. Veltri's right side. Because of the way Mr. Veltri was positioned on his bike, Officer Petty could not see Mr. Veltri's right side during their encounter. (Tr. Mot. Hr'g Nov. 24, 2008 at 20:8-11.) Officer Petty testified that after he explained to Mr. Veltri for the second time that

he only wanted to pat Mr. Veltri down, Mr. Veltri "dropped his right hand to the blind spot suddenly, and that's when [Officer Petty] pulled [Mr. Veltri] from his bike." (*Id.* at 20:12-16.) Officer Veltri testified that the movement concerned him because "hands are what kill. And if a hand is hidden in the blind spot, I don't know what's going on with it." (*Id.* at 20:17-19.)

The movement of dropping one's hand is not suspicious enough to warrant the physical detention experienced by Mr. Veltri. As described by Officer Petty, Mr. Veltri simply "dropped his right hand slightly off the bike towards his right side . . . ." (Gov't Resp. Def.'s Mot. Suppress, Ex. C.) Moreover, as Officer Petty conceded, the movement was susceptible to multiple interpretations. According to Officer Petty's Preliminary Hearing testimony, when Mr. Veltri dropped his right hand, "it looked like he was either going to flee or possibly go after something that was in his pocket . . . ." (Gov't Resp. Def.'s Mot. Suppress, Ex. B, Tr. Preliminary Hr'g 4:11-13.) Officer Petty confirmed this ambiguity in hist testimony at the December 1, 2008 Pretrial Motions Hearing.

It is true that a police officer does not need to rule out every possible innocent explanation for a person's conduct before developing a reasonable suspicion of criminal activity. *Perkins*, 363 F.3d at 327 (4th Cir. 2008). Mr. Veltri's hand movement, however, is a far cry from the type of action that can support a reasonable suspicion of criminal activity. In *United States v. Mayo*, the defendant put his hand into his pocket upon seeing a patrol car and "[t]he way [the defendant] put his hand in his pocket and the appearance of something heavy in his pocket suggested to the officers that [the defendant] had put his left hand onto a gun to protect it while he was moving." *Mayo*, 361 F.3d at 807. In *United States v. Black*, the defendant had his "right hand awkwardly inserted halfway in his right-hand pocket, 'cupped' as if 'grasping an object.'" 525 F.3d 359, 365 (4th Cir. 2008). The defendant further "hesitated to remove his hand from his pocket," had a bulge in his

pocket that could reasonably be a firearm, and upon recognizing that the police officers did not believe his explanation of the bulge, "put his hand back in the pocket where the suspected gun was." *Id.*

At the time that Officer Petty encountered Mr. Veltri, he did not have grounds to suspect Mr. Veltri was carrying a firearm. Neither the Officer Chat Log nor any other informant indicated that Mr. Veltri was carrying a firearm. He did not testify to seeing any bulges in Mr. Veltri's pockets. Mr. Veltri's hand never made it into his pocket. Mr. Veltri's hand movement was susceptible to alternative interpretations. The simple dropping of Mr. Veltri's hand was insufficient to elevate Officer Petty's general knowledge about Mr. Veltri into a reasonable suspicion that a crime was afoot. A person, even a person with a history of drug dealer affiliations, need not remain absolutely still while voluntarily interacting with a police officer in order to be free from such seizures.

The government's reliance on this one movement is further misplaced because I must look to the totality of the circumstances when assessing the reasonableness of Officer Petty's suspicion and cannot take a "divide and conquer" approach to the analysis. *Perkins*, 363 F.3d at 327. The totality of the circumstances reveal that Mr. Veltri voluntarily stopped to speak with Officer Petty during daylight hours. He did not try to avoid Officer Petty and gave no indication that he was engaged in any criminal activity. When viewed alongside the totality of the circumstances, Mr. Veltri's hand movement is even less persuasive as a grounds for reasonable suspicion. In both *Mayo* and *Black*, the officers' suspicions were supported by circumstances other than the defendants' incriminating hand movements, such as the defendant's evasive and unusually nervous behavior and the defendant's presence in a high crime area. *See Black*, 525 F.3d at 365-366; *Mayo*, 361 F.3d at 807-808. If such articulable facts supported Officer Petty's suspicion of criminal activity, perhaps

Mr. Veltri's hand movement would have heightened those suspicions. Absent such facts, Mr. Veltri's hand movement does not support a reasonable suspicion of criminal activity.

The government encourages this court to view the entire encounter, from the initial stop through the physical restraint, as an ongoing, continuous investigatory stop in which Officer Petty developed sufficient reasonable suspicion to justify grabbing Mr. Veltri. Indeed, a police officer may develop a reasonable suspicion of criminal activity based on circumstances arising in a prior legitimate detention. *See Foreman*, 369 F.3d at 782-83. For example, a police officer may detain a person beyond the scope of a permissible traffic stop based on reasonable suspicions of other crimes developed during the traffic stop. *Id.* In this case, however, the government cannot explain how the interaction between Officer Petty and Mr. Veltri provided grounds for a reasonable suspicion of some other criminal activity. Officer Petty testified that when he first stopped Mr. Veltri, he did not observe Mr. Veltri committing any crimes and had no indication that Mr. Veltri was armed. (Tr. Mot. Hr'g Nov. 24, 2008 at 36:18-22.) Mr. Veltri voluntarily stopped to speak with Officer Petty, answered the inquiries related to the Officer's Chat Log Report, and expressed a desire to exercise his Constitutional right not to be searched by Officer Petty. Though Officer Petty testified that Mr. Veltri was behaving like "[h]e didn't want to be there, like [Officer Petty] was bothering him," (Tr. Mot. Hr'g Nov. 24, 2008 at 17:14-15) his testimony does not describe any palpable, "unusually nervous behavior." *Cf. Mayo*, 361 F.3d at 808. At the point when Officer Petty grabbed Mr. Veltri, he still knew nothing more than Mr. Veltri's general affiliations and that he did not want to be searched.

Significantly, Officer Petty never testified that he had a reasonable suspicion that criminal activity was afoot prior to his grabbing Mr. Veltri's wrist. After determining that Mr. Veltri was not

riding his bicycle into traffic, Officer Petty's inquiries turned to general warrant checks, not an investigation into other suspected criminal activity. Officer Petty explained that he asked for Mr. Veltri's identification because he "wanted to check locals through records to make sure he didn't have any outstanding warrants." (Tr. Mot. Hr'g Nov. 24, 2008 at 17:21-23.) He further explained: "I was running the warrants check to make sure that he didn't have any warrants. If he needed to be arrested, I was going to arrest him." (Tr. Mot. Hr'g Nov. 24, 2008 at 18:21-25.) Moreover, Officer Petty asked Mr. Veltri to step off of the bicycle so that Officer Petty could pat Mr. Veltri down for weapons. (Tr. Mot. Hr'g Nov. 24, 2008 at 18:7-10.) Missing from these explanations is any indication that he had a reasonable suspicion that Mr. Veltri was engaged in an ongoing crime or that criminal activity was afoot. Therefore, even as a continuing detention, the totality of the circumstances in this case do not support a reasonable suspicion that criminal activity was afoot when Officer Petty seized Mr. Veltri.

What the evidence and testimony do show is that Officer Petty's seizure of Mr. Veltri was driven by Officer Petty's concern for his own safety. Officer Petty wanted to conduct the initial pat down because he "didn't want to get shot." (Tr. Mot. Hr'g Nov. 24, 2008 at 28:21-19:1.) Officer Petty explained that Mr. Veltri's body position and hand movement were disconcerting because he could not see where Mr. Veltri's hand was going. (Tr. Mot. Hr'g Nov. 24, 2008 at 20:8-21.) But a police officer may protect himself by conducting a weapons search only after he has "a basis to make a lawful investigatory stop." *Burton*, 228 F.3d at 527. As the Fourth Circuit explained:

> [A]n officer may encounter citizens and attempt to question them without implicating the Fourth Amendment. But during such police-citizen encounters, an officer is not entitled, without additional justification, to conduct a protective search. To conduct such a protective search, an officer must first have reasonable suspicion supported by articulable facts that criminal activity may be afoot.

-14-

*Id.* at 528. Officer Petty has not testified that, after determining that Mr. Veltri was not riding his bicycle into traffic, he had any reasonable suspicion that other criminal activity was afoot. Moreover, the facts articulated by the government, in totality, cannot support a reasonable suspicion that criminal activity was afoot. Absent a reasonable suspicion of criminal activity, Officer Petty was not entitled to conduct a protective search of Mr. Veltri.

The Fourth Circuit's decision in *United States v. Burton*, 228 F.3d 524 (4th Cir. 2000), provides clear guidance for the instant matter. In that case, the defendant had his hand in his pocket and refused to respond to the police during a routine police-citizen encounter. 228 F.3d at 526. When the defendant refused to remove his hand upon the police officers' request, one of the officers executed a nonconsensual weapons search and recovered a firearm from the defendant's pocket. *Id.* The Fourth Circuit vacated the district court's denial of a suppression motion because the defendant's behavior did not support a reasonable suspicion that criminal activity was afoot at the time that a police officer frisked the defendant. 228 F.3d at 529.

As in *Burton*, Officer Petty was engaged in a voluntary police-citizen encounter with Mr. Veltri before he detained Mr. Veltri. Mr. Veltri's behavior during the encounter, however, was less suspicions that the defendant's behavior in *Burton*. Rather than being non-responsive and already having his hand in his pocket, Mr. Veltri voluntarily responded to Officer Petty's inquiries and merely moved his hand to his side. If the defendant's behavior in *Burton* could not support a reasonable suspicion of criminal activity, then Mr. Veltri's behavior in this case cannot, either. The totality of the circumstances of this case show a police officer, engaged in a voluntary encounter with a citizen, who physically restrained the citizen because he became uneasy about his safety.

Such a restraint is prohibited by the Fourth Amendment—"in the absence of reasonable suspicion, an officer may not frisk a citizen merely because he feels uneasy about his safety." *Id.* at 529.

In the instant case, Officer Petty did in fact discover a firearm and drugs in Mr. Veltri's pocket. Nevertheless, I cannot evaluate these events in hindsight and must focus on the information available to Officer Petty at the time that he physically grabbed Mr. Veltri. Based on the information available to him, Officer Petty had a "hunch" that Mr. Veltri had a firearm and nothing more. *See Burton*, 228 F.3d at 527.

### III. Conclusion

Because the totality of the circumstances surrounding Officer Petty's physical seizure of the defendant do not support a reasonable suspicion that criminal activity was afoot, I **FIND** that Officer Petty's seizure of Mr. Veltri violated Mr. Veltri's Fourth Amendment rights. Accordingly, I **GRANT** the defendant's Motion to Suppress [Docket 27]. The court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: December 2, 2008

Joseph R. Goodwin, Chief Judge